ILLINOIS DEPARTMENT OF CORRECTIONS
**COMMITTED PERSON'S GRIEVANCE**

EXHIBIT # 9

| | | |
|---|---|---|
| Date: Feb. 27, 2004 | Committed Person: (Please Print) JOHNSON, RONNIE V. | ID# N-12401 |
| Present Facility: Danville | Facility where grievance issue occurred: Danville | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [x] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [ ] Medical Treatment
- [ ] Disability
- [ ] Other (specify): _____

- [ ] Disciplinary Report: ___/___/___  Date of Report  _____  Facility where Issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** On Jan. 5, 2004, patient was seen by Mr. OMUODO, Physicians Assistant (PA), who advised such person that he had been diagnosed positive for infection with the Hepatitis C Virus (HCV), and that treatment of HCV is not provided to inmates incarcerated within the Illinois Department of Corrections (IDOC), Danville Correctional Center. That is, Mr. OMUODO, PA, expressly stated: "Bad news... You have hepatitis C, and there is no cure. Eventually, you will develop cirrhosis, then, death. We do not provide treatment."

2. Although Dr. H. Lochard, Health Care Unit Director (HCUD), Mary Miller, Health Care Unit Administrator (HCUA), Dr. Shute, Medical Doctor (M.D.),

**Relief Requested:** Medical care providers be compelled to comply with accepted professional judgment, practice, or standards, in treating patient's HCV; monetary compensation of $1.5 million for compensatory and punitive damages.

[x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_JR, R_ V._  N-12401  2/27/04
Committed Person's Signature   ID#   Date

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: ___/___/___   [ ] Send directly to Grievance Officer   [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

_____

Print Counselor's Name   Counselor's Signature   Date of Response

---

**EMERGENCY REVIEW**

Date Received: 3/2/04   Is this determined to be of an emergency nature?
[ ] Yes; expedite emergency grievance
[x] No; an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

Previously addressed 1/26/04 - Denied.

_Blair J. Leibach_   3/2/04
Chief Administrative Officer's Signature   Date

and Wexford Health Source, Inc., Corrections Health Care Division (WEXFORD), personally know of the serious danger and excessive risk that a lack of treatment poses to patient's health and safety (SEE ATTACHED EXHIBITS - G thru G12), medical care providers, however, have consciously concurred with the omission, obstruction, and denial of medical services. For which reason, patient reasonably surmises that "WEXFORD" who works as a private contractor for the IDOC, has a blanket policy or other informal practice of deferring treatment of prisoners who are infected with HCV and who require costly treatment to manage the disease.

3. On Jan. 21, 2004, therefore, patient filed an emergency grievance under nature of "medical treatment" requesting that medical care providers be ordered to cease and desist from engaging in the practice of delaying or denial of patient's access to medical services and to exercise professional judgment which was not followed after it was initially exercised. That is, after medical care providers diagnosed patient with HCV, to follow-up by conducting further tests that the patient's symptoms call for. Particularly, serologic testing such as genotyping and serotyping of HCV, and to perform a liver biopsy for purposes of grading the severity of the disease and staging the degree of liver damage. (SEE ATTACHED EXHIBITS - B and F "Serologic Tests"/"Liver Biopsy")

4. On Jan. 26, 2004, Cynthia P. Embry, Grievance Officer, reported that Mary Miller, HCUA, responded to the grievance. She (HCUA) confirmed that patient tested positively for hepatitis. However, "she says he (patient) is incorrect that he meets all the criteria for treatment." (SEE ATTACHED EXHIBIT - B)

5. On Feb. 9, 2004, patient appealed Mary Miller's response directed to the Director of IDOC, via the Administrative Review Board. Patient, Moreover, filed his **REBUTTAL IN OPPOSITION** to Mary Miller's response, calling into question the veracity of the HCUA (SEE ATTACHED EXHIBIT - B1) and heretofore, counterpoises that specialists on the treatment and management of HCV point out "that detection and treatment of HCV should begin as early as possible." (SEE ATTACHED EXHIBITS - D, E, and F - "Treatment") The fact that patient has been infected between 4 to 8 years makes it important that he undergo a liver biopsy to assess the degree of liver damage, and that treatment begin before he develops necrosis, fibrosis, cirrhosis, liver cancer, liver failure, kidney disease, neuropathy, etcetera, etcetera, etcetera.

6. Patient has made it clear that he is in need of immediate medical attention and that his pending medical condition is becoming exasperated by the denial of medical services, thereby causing him serious concern that medical care providers are essentially attempting to murder him **(as many other prisoners have already died)** by allowing the unchecked degeneration and irreversible deterioration of liver cells, and subsequently cause death to him. (SEE ATTACHED EXHIBIT - B1)

7. To no avail, patient has submitted no less than thirty-six (36) written requests to medical care providers, (SEE ATTACHED EXHIBITS - H thru H8) for an interview to discuss WEXFORD'S criteria for treatment of hepatitis and the basis upon which Wexford's contracted medical personnel have refused or failed to perform follow-up Serologic testing and to conduct a liver biopsy. Medical care providers have quite simply ignored patient. Wherefore, in conjunction with all of the reasons enumerated in the foregoing paragraphs, patient affirmatively asserts and alleges that Dr. H. Lochard, HCUD, Mary Miller, HCUA, Dr. Shute, M.D., and WEXFORD, are exercising deliberate indifference to such person's health and safety by failing to afford him the opportunity to receive appropriate medical treatment and/or therapy for a pending and increasingly degenerative liver disorder. (SEE ATTACHED EXHIBITS - D,E,F, and G thru G12)

8. As a result of the deliberate indifference exercised by the aforementioned medical care providers, patient is suffering extreme anxiety, depression, aggravation, mental anguish, emotional distress, and pain i.e. abdominal pain, diarrhea, nausea and vomiting, loss of appetite, weakness, and tiredness. And as of today said mental and physical conditions still persist and continue daily, thereby causing patient serious and great apprehension and concern.

9. The HCV attacks the liver and is often fatal if untreated. There is no cure for HCV, but treatment with Alpha-Interferon and Ribavirin can render HCV undetectable in about half the patient's blood. (SEE ATTACHED EXHIBIT - F "TREATMENT") The medications cost between $10,000 and $15,000 annually per person. Treatment regimes usually last 6-12 months. Regimes using Pegylated Interferon and Ribavirin is the community standard of care according to the National Institutes of Health 2002 Consensus Panel. This is more expensive, but much more effective.

10. Deliberate indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusal punishment. Chapman v. Kelter, 241 F.3d 842, 845 (7th Cir. 2001); Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001), citing Estelle v. Gamble, 429 U.S. 153, 182-83 (1976). The injury or need must be objectively serious, and the official must personally know of the risk and consciously disregard it. See Henderson v. Sheahan, 196 F.3d 839, 845 (7th Cir. 1999); Mathis v. Fairman, 120 F.3d 88, 91 (7th Cir. 1997); Wynn v. Southward, 251, F.3d at 593 (2001). An objectively serious injury or medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Chapman, 241 F.3d at 845, quoting Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997)). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction

of pain."' Reed v. McBride, 178 F.3d 849, 852 (7th Cir. 1999), quoting Gutierrez, 111 F.3d at 1373. The subjective component (deliberate indifference) does not encompass negligence or even gross negligence. Id., citing Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991); Farmer v. Brennan, 511 U.S. 825, 836 (1994). The prisoner must "show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health and safety." Wynn, 251 F.3d at 593, citing Farmer v. Brennan, 511 U.S. at 837; Zentmyer, 220 F.3d at 811. A prisoner is not required to show that he or she was "literally ignored." Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000)(jury could find deliberate indifference, "[i]f knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell."). Deliberate indifference may also be inferred "when the medical professional's decision is such a substantial depature from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." Estate of Cole v. Pardue, 94 F.3d 254, 261-62 (7th Cir. 1996).

11. Patient's allegations infer mor than mere negligence. His allegations infer that the aforesaid medical care providers are deliberately indifferent to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97 (1976). The allegations support an inference that the failure to provide the serologic testing, liver biopsy, and theraputic treatment, is a substantial departure from accepted practice and that the aforesaid medical care providers concurred with the departure. See Bond v. Aguinaldo, 288 F.Supp. 2d 918, 920 (7th Cir 2002)("Except in the unusual case where it would be evident to a lay person that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.") In this case, patient alleges that IDOC, via WEXFORD, has a blanket policy or other informal practice of denying medical treatment for prisoners who are infected with HCV - a condition that indicates theraputic treatment is needed to manage the condition. The State of Illinois has "an affirmative obligation under the Eighth Amendment to provide persons in custody with a medical care system that meets minimal standards of adequacy." Meriwether v. Faulkner, 821 F.2d 408, 411 (7th Cir. 1987) citing Benson v. Gadv, 761 F.2d 335, 339 (7th Cir. 1985); Wellman, 715 F.2d at 271). Further, patient's allegations are more than a disagreement with medical decisions. He does not allege that Dr. Lochard, Mary Miller, Dr. Shute, or WEXFORD, chose a more conservative treatment of his infection with HCV. In fact, he alleges Mr. OMUODO, PA, advised him that medical care providers at Danville Correctional Center "do not provide treatment" for prisoners infected with HCV.

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**COMMITTED PERSON'S GRIEVANCE (Continued)**

12. Prison conditions that amount to "unquestioned and serious deprivations of basic human needs" or of the "minimal civilized measure of life's necessities" violate the Eighth Amendment. Rhodes v Chapman, 452 U.S. 337; accord, Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 2324 (1991). The Supreme Court has listed as basic human needs "food, clothing, shelter, medical care and reasonable safety..." Wilson Deprivations of basic needs which are serious enough to amount to the "wanton and unnecessary infliction of pain" violate the Eighth Amendment. Rhodes And unsafe conditions that "pose an unreasonable risk of serious damage to a prisoners future health" may violate the Eighth Amendment even if the damage has not yet occurred. Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 2481 (1993) ("A remedy for unsafe conditions need not await a tragic event").

13. The standard algorithm for treatment of HCV is: a) make the diagnosis based on aminotransferase (ALT) elevations (SEE ATTACHED EXHIBITS - G thru G8/G10 (elevated AST/ALT levels)); b) test for antibody to HCV (anti-HCV), indicating ongoing or previous infection with the virus (SEE ATTACHED EXHIBITS G9/G11); c) confirm the diagnosis of Hepatitis C by testing for the presence of HCV RNA in serum which indicates an active infection (SEE ATTACHED EXHIBIT G12); d) perform a liver biopsy to assess the grade and stage of the disease (Disregarded); e) assess patient for suitability of therapy and contraindications (Disregarded); and, f) test for HCV genotype (or serotype) to help determine the duration of therapy and dose of medication (Disregarded). In this case, Mary Miller, HCUA, has purported that patient does not meet "all the criteria for treatment". He counterpoises that medical care providers have not conducted all of the standard preliminary tests necessary for treatment to begin. Wherefore, based on the failure to perform a liver biopsy and absence of even a modicum of scientifically verifiable information to assess the grade and stage of liver disease, patient is utterly astounded and baffled at the mystery by which Mary Miller professes to set forth a factually based medical opinion, for which are no facts sufficient to substantiate the legitimacy thereof. In fact, the remarks of Mary Miller are patently false and evidences the calculated working of a duplicitous and culpable state of mind - a coldly scheming or conniving and deceitful mindset - a ploy to deflect attention away from the acts or omissions of her accomplice co-defendants and secret cooperation between the same to defer or deny medical treatment. See Langston v. Peters, 100 F.3d 1235, 1240 (7th Cir. 1996) excessive delays in medical diagnosis or treatment can establish deliberate indifference.

MAR 9 - 2004

PLAINTIFF'S EXHIBIT - J

DATE: March 2, 2004

TO: Mary Nichols, Assistant Warden of Programs, Danville Correctional Center.

FROM: Inmate Ronnie V. Johnson, N-12401, Housing Unit / Cell No. 1-B-36

SUBJ: Denial of Medical Treatment and Equal Protection of Law.

Mary Nichols, A/W Programs:

This is to appeal to your office to ensure that I receive necessary medical care.

If you will, as set forth in the attached grievance report, on Jan. 5, 2004, I was advised by prison medical staff that I tested positively for Hepatitis C Virus ("HCV") and that prison medical staff at Danville does not provide treatment for HCV.

Out of concern for the safety and security of my life, I filed a grievance on Jan. 21, 2004, requesting that prison medical staff be ordered to conduct all tests that my condition calls for and that I should be provided with treatment.

In response to the grievance, Mary Miller confirmed the positive diagnosis but, she asserted I do not meet criteria for treatment.

Contrary to the response by Mary Miller, the only method for determining criteria for treatment of HCV is to perform a liver biopsy, to assess the grade of the severity of the disease and to stage the degree of liver damage - a procedure that Mary Miller is refusing to afford me.

Also, contrary to accepted professional judgment, practice, or standards in treating my condition, prison medical staff refuses to conform its practices even to the basic follow-up procedures. That is to say, that the standard algorithm for treatment of HCV are: (I) make the diagnosis of infection based on aminotransferase (ALT) elevations, (II) verify diagnosis by checking for Anti-HCV and HCV RNA in the serum, (III) perform a liver biopsy to determine the degree of liver damage, (IV) assess the patient for suitability of therapy and contraindications, (V) discuss with patient side effects and possible treatment outcomes, (VI) test for HCV genotype, and (VII) test for HCV RNA level immediately before starting therapy.

On information and belief, I have not been provided with appropriate testing and treat-

ment because there is an informal policy at Danville, via Wexford Health Source, Inc., of giving low priority to the medical needs of prisoners with HCV and of refusing to provide them with medical care outside the prison unless their medical condition is imminently life-threatening.

Theraputic evaluation and treatment of HCV are not provided in prison at Danville; prisoners needing such services must be taken to an outside facility.

Based on personal review of my health care records, I have been infected with HCV from anywhere between 4 to 8 years, which (according to specialists) makes it extremely important that I undergo a liver biopsy to assess the degree of liver damage, and that treatment begin before I develop irreversible damage such as: Thyroid disease, Cirrhosis, liver Cancer, kidney disease, etcetera.

I am suffering irreparable harm in the form of continued physical and mental pain and suffering and an increasing risk that my life is needlessly jeopardized and endangered by the unchecked progression of HCV and deterioration

of liver cells, which may subsequently cause my demise.

Mary Miller is the Medical Administrator at Danville and is responsible for scheduling medical appointments outside the prison when a prisoner needs specialized evaluation or treatment.

You, Mary Nichols, are the A/W Programs at Danville and are in charge of transportation of prisoners to medical appointments.

Together, both you and Mary Miller have the responsibility for providing me the necessary access to a specialist for evaluation or treatment as well as the ability to arrange it.

For the reasons set forth in this written communication, I believe that I am entitled to an order from your office restraining prison care providers from deliberately endangering my life, to arrange for an examination and a plan of treatment by a qualified specialist, and to an order requiring prison care providers to carry out that plan of treatment.

Respectfully submitted,
Ronnie V. Johnson, N12401

cc: Mary Miller, HCUA

ILLINOIS DEPARTMENT OF CORRECTIONS
**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

### Grievance Officer's Report

R&
MAR 22 2004
GRIEVAN...

Date Received: _____ Date of Review: 03/22/04    Grievance # (optional): DN3-34

Committed Person: Johnson, Ronnie 1B36    ID#: N12401

Nature of Grievance: Medical Treatment — Inmate wants an examination and a plan of treatment by a qualified specialist, and an order requiring prison care providers to carry out that plan of treatment.

Facts Reviewed: Health Care Unit Administrator Mary Miller advises that this inmate was given all the appropriate testing and the doctor is following him closely. On 03/04/04 the doctor explained the criteria for treatment for Hepatitis C and advised that as of that date he was not a good candidate for the Hepatitis C treatment.

Recommendation: Based on a review of all available information this Grievance Officer recommends that this grievance be denied. Inmate has been evaluated and a determination made that he is not a good candidate for Hepatitis C treatment at this time.

Cynthia P. Embry                            Cynthia P. Embry
Print Grievance Officer's Name              Grievance Officer's Signature

(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

### Chief Administrative Officer's Response

Date Received: 3/22/04    ☒ I concur    ☐ I do not concur    ☐ Remand

Comments: _____

_Lubuck_                                    3/22/04
Chief Administrative Officer's Signature    Date

### Committed Person's Appeal To The Director

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

Johnson, Ronnie V.                N-12401        3/30/04
Committed Person's Signature      ID#            Date

ILLINOIS DEPARTMENT OF CORRECTIONS  EXHIBIT # 11
COMMITTED PERSON'S GRIEVANCE

| | | |
|---|---|---|
| Date: April 14, 2004 | Committed Person: (Please Print) JOHNSON, RONNIE V. | ID#: N-12401 |
| Present Facility: Danville | Facility where grievance issue occurred: Danville | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Mail Handling
- [ ] Restoration of Good Time
- [ ] Disability
- [ ] Staff Conduct
- [ ] Dietary
- [X] Medical Treatment
- [ ] Other (specify): _____
- [ ] Transfer Denial by Facility
- [ ] Transfer Denial by Transfer Coordinator

- [ ] Disciplinary Report: ___/___/___
  Date of Report             Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
  Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
  Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
  Chief Administrative Officer, only if EMERGENCY grievance.
  Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: 01. On March 2, 2004, Inmate Johnson complained to Mary Nichols, Asst./Warden of Programs (AWP), that he is being denied treatment for Hepatitis-C (Hep-C) and that he appealed to Mary Nichols, AWP, that she would ensure that such person receive necessary medical care. (SEE ATTACHED EXHIBIT - J)
02. In response to the appeal concerning medical issue, Mary Nichols, AWP, commissioned the Grievance Officer to investigate and review facts.
03. Prompted by Grievance Officer's inquiry regarding allegation of failure to provide treatment for Hep-C, on March 4, 2004, such person was seen by Dr. Ronald Schaefer, MD, who gave a prepared statement advising such

Relief Requested: Referral to a specialist - either a gastroenterologist or a hepatologist - for further evaluation and treatment; a liver biopsy and/or a transfer to Dixon Corr. Center's Medical Health Care Unit. Hep-A&B Vaccines.

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Johnson, Ronnie V.     N-12401    04/14/04
Committed Person's Signature   ID#   Date

(Continue on reverse side if necessary).

**Counselor's Response (if applicable)**

Date Received: ___/___/___
- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

Print Counselor's Name         Counselor's Signature         Date of Response

**EMERGENCY REVIEW**

Date Received: ___/___/___   Is this determined to be of an emergency nature?
- [ ] Yes; expedite emergency grievance
- [ ] No; an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

RECEIVED
MAY 1 2 2004

Chief Administrative Officer's Signature              Date

ILLINOIS DEPARTMENT OF CORRECTIONS
COMMITTED PERSON'S GRIEVANCE (Continued)

person that the fact he is a diabetic disqualifies such person for Hep-C Treatment. Moreover, Dr. Schaefer, MD, advised such person that he has a Hep-B coinfection of which is an automatic contraindication for Hep-C treatment.

04. Inmate Johnson, trusting in the assumed honesty and integrity of Dr. Schaefer, MD, therefore, believed the validity and truthfulness of statement advising of dire medical dilemma. For which reason, on or about March 8, 2004, such person wrote a letter of apology to Mary Miller, RNBS, HCUA, relative to previous accusations of deliberate indifference to such person's serious medical needs.

05. In response to request for repeat Hep-B panel, on March 10, 2004, such person was received by the lab for serum specimen. (SEE ATTACHED EXHIBIT - K)

06. On March 15, 2004, Mary Miller, RNBS, HCUA, acknowledged receipt of the abovesaid letter of apology. (SEE ATTACHED EXHIBIT - M) Following a review of the letter, such person thereupon requested, in writing, to have a meeting with Dr. Schaefer, MD, to discuss a plan of care for treatment of such person's symptoms i.e., pain, and monitoring the progression of underlying disease. (SEE ATTACHED EXHIBIT - O.

07. On March 15, 2004, Mary Miller, RNBS, HCUA, in response to Grievance Officer's inquiry regarding allegation of failure to provide treatment of Hep-C, issued a formal statement asserting that "He is not a good candidate for Hepatitis C treatment." Also, "He has been given all appropriate testing and Dr. is following him closely." (SEE ATTACHED EXHIBIT - N)

08. On March 17, 2004, Mary Nichols, AWP, advised such person that "the facility is following IDOC guidelines/protocol for Hepatitis C Treatment. You need to address this issue through the grievance process..." (SEE ATTACHED EXHIBIT - P

09. On March 30, 2004, such person received the Grievance Officer's report regarding correspondence concerning medical issue. The report recommended that the grievance (correspondence) be denied based on a review of all available information. (SEE ATTACHED EXHIBIT - Q)

ARGUMENT I.

DILATORY AND EVASIVE TACTICS TO REFUSE OR DELAY HEP-C TREATMENT.

10. Inmate Johnson argues that the March 4, 2004, meeting with Dr. Schaefer, MD, (SEE ¶¶ 3 and 4) was a farce and a ruse - a theatrical performance by Dr. Schaefer, MD, and a skillfully underhanded and deceptive scheme devised in secret and orchestrated by Mary Miller, so as to achieve the effect of derailing such person's relentless efforts to secure proper medical care.

**RECEIVED**
MAY 1 2 2004
OFFICE OF

### ARGUMENT II.

#### DIABETES NOT A CONTRAINDICATION FOR HEP-C TREATMENT.

11. On March 3, 2004, Inmate Johnson obtained possession of Dr. Melissa Palmer's Guide To Hepatitis & Liver Disease. Dr. Melissa Palmer, MD, is a nationally renowned gastroenterologist and hepatologist (liver specialist) and board-certified in both internal medicine and gastroenterology. Moreover, Dr. Melissa Palmer, MD, has perhaps the largest solo practice devoted to hepatitis and liver disease in the United States. (SEE ATTACHED EXHIBIT R, R-1 and R-2)

12. At ¶ 03. hereof, Dr. Schaefer, MD, who is a primary care physician and practicing general medicine, advised such person that the simple fact he has diabetes disqualifies such person for Hep-C Treatment. Inmate Johnson argues that Dr. Schaefer, MD, is a primary care physician and does not have specialized training in the care of liver disease and that when primary care physicians discover something is wrong with a patients liver, from there, the patient is customarily referred to a specialist - either a gastroenterologist or a hepatologist - for further evaluation and treatment. Relative to Dr. Schaefer's medical opinion, Dr. Melissa Palmer, MD, debunks the misdirected conclusion that persons with diabetes are automatically disqualified as a candidate for Hep-C Treatment. (SEE ATTACHED EXHIBITS R-3 and R-4)

13. It should be further noted that during the March 4, 2004, meeting with Dr. Schaefer, MD, that such person assertively posited that from October 24, 2002, he discontinued the use of insulin injections, that he has not ever ingested any diabetic pills, and that he controls his diabetes by way of adherence to a vegan diet, exercise, and weight loss.

### ARGUMENT III.

#### NO HEPATITIS - B COINFECTION.

14. At ¶ 03. hereof, Dr. Schaefer, MD, advised such person that he has a Hep-B coinfection of which disqualifies such person for Hep-C Treatment. Inmate Johnson argues in this regard, however, that on March 10, 2004, he submitted a serum specimen to the lab for repeat Hep-B panel. Although results of test was available on March 15, 2004, somehow the Grievance Officer failed to obtain a copy thereof. On April 6, 2004, Inmate Johnson received a copy of the test results of which conclusively evidences a repeatedly negative reaction for both Hep-A aand Hep-B. (SEE ATTACHED EXHIBIT - L)

### ARGUMENT IV.

#### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS OF PATIENT.

RECEIVED
MAY 1 2 2004
OFFICE OF
INMATE ISSUES

15. Inmate Johnson is suffering from diagnosed Hep-C disease and is dying a slow and painful death. His only hope now is to serve the remainder of his sentence before he dies from a disease which, if untreated destroys his liver.

16. Inmate Johnson argues in this regard that the Illinois Department of Corrections, Danville Correctional Center (IDOC,DCC), has contracted with Wexford Health Sources, Incorporated, Corrections Health Care Division, 1001 West Central Street, Marion, Illinois, 62959, a health maintenance organization, or HMO, to keep costs under control. Wexford Health Sources (WEXFORD) has a fixed budget or receives a set fee based on the number of patients served. Because WEXFORD is allowed to keep any money they don't spend on health care, they have an incentive to cut corners to pad their profits. This is being done at IDOC, DCC by denying such person's access to a specialist, refusing or delaying treatment, withholding a liver biopsy and other tests. In this case, Dr. Ronald Schaefer, MD, and Mary Miller, RNBS, HCUA, are delaying care and allowing the unchecked progression of the Hep-C disease until treatment will be of no benefit by the time such person is released in order to save the system money. Inmates have died at IDOC, DCC as a result of negligence, indifference and overzealous cost-cutting. The way Inmate Johnson is being treated is a horror. Hep-C disease and IDOC, DCC's refusal to treat it has turned such person's remaining years into a death sentence.

cc: file
    Mary Nichols, AWP

RECEIVED
MAY 1 2 2004
OFFICE OF

# ILLINOIS DEPARTMENT OF CORRECTIONS
## RESPONSE TO COMMITTED PERSON'S GRIEVANCE

### Grievance Officer's Report

1B 36

Date Received: *[RECEIVED APR 20 2004 GRIEVANCE OFFICER]*
Date of Review: 04/20/04
Grievance # (optional): DN4-93

Committed Person: Johnson, Ronnie
ID#: N12401

Nature of Grievance: Medical - Treatment. Inmate Johnson alleges that there has been deliberate indifference to the serious medical needs of the patient. He wants referral to a specialist for further evaluation and treatment.

Facts Reviewed: Medical Director Schaefer states that he repeated the Hep B test to make sure that there was no sign of Hep B. He states that diabetes does put you at increased risk while on the meds for Hep B. A PI/PII Blood test has been ordered. If those tests were to come back normal, the next step would be a liver biopsy.

Recommendation: Based on a review of all available information this Grievance Officer recommends that this grievance be denied. The doctor needs to complete the PI/PII blood test & if necessary a liver biopsy before making a final decision about the need for a specialist.

Cynthia P. Embry
Print Grievance Officer's Name

Cynthia P. Embry
Grievance Officer's Signature

(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

### Chief Administrative Officer's Response

Date Received: 4/21/04
[X] I concur    [ ] I do not concur    [ ] Remand

Comments: _____

Lurbach
Chief Administrative Officer's Signature

4/21/04
Date

### Committed Person's Appeal To The Director

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

Johnson, Ronnie V.
Committed Person's Signature

N-12401
ID#

5/08/04
Date

**RECEIVED**
MAY 12 2004

HepNet- Drugs Better Than 'Wait And See' for Mild Hepatitis C               Page 1 of 2



The Hepatitis
Information Network
HepNews





News Release

Drugs Better Than 'Wait And See' for Mild Hepatitis C

Quick Sear

options

Hepatitis

Hepatitis

Hepatitis

Hepatitis

Hepatitis

(feedback)

**Monday November 6, 2000**

NEW YORK (Reuters Health) - For people with mild cases of hepatitis C, combination drug therapy appears not only to be more likely to prolong life and to prevent complications such as cirrhosis, but also to be more cost-effective than a strategy of ``watchful waiting,'' according to new research.

An estimated 170 million people worldwide and 2.7 million in the US have chronic hepatitis C infection. Because of the lag time between infection and illness, the disease often goes undetected for years until a person develops serious complications.

Even when hepatitis C is detected early, deciding what, if any, treatment is needed is difficult, according to Dr. John B. Wong, of New England Medical Center in Boston, Massachusetts.

``Not everyone (with hepatitis C) will develop advanced liver disease though, but at this time, physicians cannot accurately distinguish those who will progress from those who will not,'' he told Reuters Health.

The best way to decide on a treatment is to analyze a small sample of liver tissue through a procedure called a biopsy, according to Wong. If the biopsy indicates cirrhosis, which is severe scarring of the liver, pre-cirrhosis or substantial inflammation of the liver, then most doctors would recommend treatment, Wong explained. For people with normal biopsy results, treatment is not usually recommended, he said.

The tricky decision is what to do with people with mild inflammation of the liver, the Boston researcher added. Combination drug therapy with interferon and ribavirin may treat the hepatitis infection, but the drugs can cause unpleasant side effects and do not clear the virus in all people, Wong said.

But the ``watchful waiting'' approach requires a person to have repeated liver biopsies, which carry a ``small but real'' risk of complications, Wong said. He also pointed out that drug therapy may not be as effective when started after scarring has occurred or in older people.

Using a computer model, Wong's team analyzed the long-term



# 22

EXHIBIT # 13

# Liver Transplantation

Fortunately, most people with chronic liver disease will never need a liver transplant. So why read this chapter? Well, all people who have chronic liver disease are at risk (which varies depending upon a multitude of factors) for the associated complications of chronic liver disease. These include cirrhosis, liver failure, liver cancer, and intolerable symptoms, such as severe itching and fatigue. If one or more of these complications occur, a person may become a candidate for a liver transplant. Therefore, all people with chronic liver disease and their family members can benefit by reading this chapter to increase their understanding of liver transplantation. More important, it is crucial for people to be aware that liver transplantation is an accepted standard treatment option for those with liver failure and that it is a quite successful, life-saving operation.

Only people who have the greatest likelihood of survival should undergo a liver transplant; therefore, this chapter discusses those people who make good candidates and those people who make poor candidates for transplantation. This chapter also discusses the evaluation process that leads to a person becoming listed for a liver transplant. General indications for transplantation and specific indications based on individual liver disorders are detailed. The biggest problem in the field of liver transplantation is that there is an ever growing scarcity of available livers for donation. This issue and some potential solutions to this problem are also discussed in this chapter. Issues of post-transplant medications and what to expect after a liver transplant conclude this chapter.

## THE HISTORY AND SUCCESS RATE OF LIVER TRANSPLANTS

The first successful human-to-human liver transplant was performed by Dr. Thomas Starzl in 1968. (The first attempt at liver transplantation occurred in 1963 but was unsuccessful.) Liver transplantation is now a routinely successful operation. The high success rate is due to the many advances that have occurred since the early days

*313*

of transplantation, when the one-year survival rate after a liver transplant was less than 30 percent. Now, approximately 85 to 90 percent of people will survive at least one year, and approximately 75 to 85 percent of people will survive at least five years after receiving a new liver. Not only can people live a long life after a liver transplant (one person has been living with a transplanted liver for over twenty-eight years!), but the quality of life is typically excellent. Most people can return to their regular jobs and daily routines without limitations.

According to the website maintained by United Network for Organ Sharing (UNOS), there are currently 123 transplant centers in the United States. In 1997, there were 4,167 liver transplants performed in the United States—out of a transplant waiting list that numbered 11,745. In 1999, 12,487 people were on the liver transplant waiting list.

## DETERMINING WHO NEEDS A LIVER TRANSPLANT

Simply having chronic liver disease or even cirrhosis does not automatically indicate or qualify a person for a liver transplant. Certainly, a person does not want to wait until it is too late to be evaluated for a transplant. On the other hand, it is not necessary that everybody with chronic liver disease be evaluated for a liver transplant as soon as a liver problem is discovered. So, is there some kind of special gauge hidden on the body that only an experienced liver specialist can see that tells her when it is time to send her patient for a transplant evaluation? Well, not exactly. However, there are some specific criteria that are used when making this decision. Depending on the underlying liver disease, specific indications for liver transplantation vary somewhat. Indications for a transplant that are specific to the cause of liver disease will be addressed on page 316. The following section is a brief discussion of some general indications for liver transplant independent of the cause of liver disease.

## GENERAL INDICATIONS FOR LIVER TRANSPLANT

A person is referred for a liver transplant when it is estimated that she will not live more than two years without a new liver. Accordingly, evidence of decompensated cirrhosis (such as ascites, variceal bleeding, or encephalopathy) is an indication for liver transplantation. Any manifestation of liver failure, whether due to acute or chronic liver disease (such as persistent jaundice or coagulopathy) is an indication for liver transplantation. People who have developed liver cancer due to chronic liver disease should also be evaluated for a transplant. People with intolerable symptoms due to chronic liver disease, such as relentless fatigue or intractable itching, that significantly diminish the quality of life, may also be candidates for a liver transplant evaluation. Finally, some people who had liver transplants in which the newly transplanted liver is not functioning are candidates for transplantation. While it is crucial that a patient be evaluated by a liver transplant center once one of the above-

---

mentioned conditions have developed, m
therapy and should be utilized to stabiliz

### THOSE WHO ARE POOR CANDIDA1

A liver transplant is obviously a very ser
the transplant surgeon and the transplant
ones. It is of utmost importance that the c
takes into consideration the probability tl
There is a shortage of donor livers avail
continues to worsen. It stems, in large pa
transplantation. Therefore, when dealing
as a donor liver, the transplant team will
is a good candidate for the operation.

There is a list of conditions that dis
transplant because a successful outcome :
*absolute contraindications* and include tl

- HIV positivity.
- Cancer presently existing in an organ
- Severe active infection.
- Active substance abuse (for example,
- Irreversible brain dysfunction.
- Advanced heart or lung disease.
- Pychosocial assessment indicating an medication regimen and instructions.

There are many other conditions that but do not rule out the possibility. These *contraindications*, include:

- Age (approximately seventy years old
- Previous cancer in an organ other tha period is required between treatment o: is due to the high incidence of cancer transplant immunosuppression drugs p
- Kidney failure.
- Morbid obesity.
- Malnutrition.